NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4316
_____

UNITED STATES OF AMERICA

v.

MIGUEL ORTIZ,
a/k/a MIGUELITO,
a/k/a MIGUEL ORTIZ ROSADO,
a/k/a MIGUELINE, a/k/a TONTO

Miguel Ortiz,
                    Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:11-cr-00251-001)
District Judge: Honorable Jan E. DuBois
_____

Argued March 2, 2016

Before:  SMITH and HARDIMAN, *Circuit Judges*.*

(Filed: July 15, 2016)

_____

        * The Honorable Dolores K. Sloviter assumed inactive status on April 4, 2016, after the argument and conference in this case, but before filing of the opinion. This opinion is filed by a quorum of the panel pursuant to 28 U.S.C. § 46(d) and Third Circuit I.O.P. Chapter 12.

Peter Goldberger, Esquire (Argued)
Pamela A. Wilk, Esquire
50 Rittenhouse Place
Ardmore, PA 19003
        *Attorneys for Appellant*

Zane David Memeger, Esquire
Robert A. Zauzmer, Esquire
Emily McKillip, Esquire (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
        *Attorneys for Appellee*

_____

OPINION**
_____

HARDIMAN, *Circuit Judge*.

In April 2013, a jury convicted Miguel Ortiz of: (1) conspiracy to distribute five or more kilograms of cocaine; (2) two counts of distributing five or more kilograms of cocaine; (3) distributing five kilograms or more of cocaine within 1,000 feet of a school; and (4) three counts of money laundering. For his crimes, Ortiz was sentenced to 30 years' imprisonment. On appeal, Ortiz challenges two of the District Court's evidentiary rulings as well as his sentence. We will affirm.

I

A

In 2010 and 2011, Nelson Rodriguez led a drug trafficking ring in Philadelphia. His operation was based in a garage that had entrances on two streets, one on Jasper

---

** This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Street and another on Helen Street. Ortiz acted as a supplier for Rodriguez, providing as many as 100 kilograms of cocaine at a time.

Alerted to the possibility of drug trafficking activities at Rodriguez's garage, law enforcement officers installed two "pole cameras" (video cameras attached to local utility poles) to record the comings and goings there. One camera captured the Helen Street side of the garage, while the other focused on Jasper Street. The cameras recorded video 24 hours a day between January 10, 2011, and March 30, 2011.

DEA Special Agents David Pedrini and Paul Gimbel were in charge of collecting the video from the pole cameras and they alternated viewing them on a weekly basis. Pedrini was responsible for January 17–21 and January 30–February 5, so he wrote the official DEA-6 reports for those weeks. Because Gimbel was responsible for January 23–29, he wrote the DEA-6 report for that week. Regardless of whose week it was, whenever something of interest occurred, the event was flagged and both agents reviewed the tape together.

According to the DEA-6 reports, the pole cameras recorded Ortiz or his vehicle at Rodriguez's garage on multiple occasions. However, before trial (and before the defense had the chance to review them), the pole camera recordings from the Helen Street camera for January 12–February 26 were destroyed. The parties agree that the loss of the recordings was accidental.

As the investigation progressed, Agent Pedrini began to connect a June 8, 2010 DEA seizure of just over $2 million on a Philadelphia highway to Ortiz and Rodriguez. Pedrini learned that Rodriguez's tally sheet showed that he paid Ortiz on June 4, 7, and 8

3

a total of $1.9 million. And Rodriguez himself told investigators that Ortiz called him sometime in the summer of 2010 and stated that "the truck had been stopped . . . with the money" and that he "was going to rest it out and try to cool off." App. 1125. Ortiz then ceased supplying cocaine to Rodriguez for a time.

## B

Ortiz was indicted on various drug and money laundering charges. As relevant here, he filed two pretrial motions: one to prevent Gimbel and Pedrini from testifying to what they saw on the lost pole camera recordings, and another to bar the introduction of the slightly more than $2 million seized in June 2010. The District Court denied both motions.

With respect to Ortiz's motion to exclude testimony related to the lost recordings, the Court found the testimony admissible as secondary evidence under Federal Rule of Evidence 1004. Because the recordings were lost, there were valid concerns about hearsay testimony by the agents and that the defense would be less able to effectively cross-examine them. There were also concerns that the jury would confuse whether the agents actually viewed the events live or on a recording and that the testimony might not be rationally related to the agents' perceptions. In light of these issues, the Court placed two restrictions on the evidence: (1) the agents' testimony was "limited to those sections of their respective reports which were derived entirely from their personal observation of the now-missing pole camera footage;" and (2) neither agent was permitted to "testify regarding any part of his report which was based, in whole or in part, on any source other than his personal observation of the now-missing camera footage." App. 13.

4

As for Ortiz's motion to exclude the seized cash, the Court determined that the money was admissible as intrinsic evidence of the crime charged. The Court concluded that those funds were evidence of the charged conspiracy given the tally sheet, Ortiz's statement to Rodriguez that the truck had been seized and he needed to lay low, and Ortiz's decision not to supply cocaine for a time.

C

At trial, Agents Gimbel and Pedrini testified to what they had seen on the lost recordings. Pedrini testified as to the content of the January 28 recording for which he did not write the DEA-6 report, and Gimbel did likewise with regard to the February 3 and 10 recordings. Ortiz lodged a continuing objection to this testimony on the basis that it ran afoul of the District Court's pretrial ruling that limited the agents to testifying about the days for which they wrote a DEA-6 report. App. 775–76, 778–79. The Court overruled the objection, stating that its prior ruling did not preclude the agents from testifying as to their personal observations even absent a report. App. 779–82. The Court explained that its pretrial ruling merely held the agents could not testify to the occurrences of a specific day if they had no independent recollection of the relevant events and had not personally written the report for that day. *See* App. 780. The jury convicted Ortiz on seven counts.

D

Following his conviction, Ortiz faced a recommended sentence of life imprisonment under the United States Sentencing Guidelines (USSG). Ortiz sought a downward variance, claiming his diminished life expectancy would render any term of

5

imprisonment greater than 25 years essentially a life sentence. The Court explicitly denied his request stating: "I'm also denying the motion [for a variance] based on your diminished life expectancy based on Type II diabetes." App. 2025. Nevertheless, the Court imposed a below-Guidelines sentence after finding that a life sentence would be "excessive" and that 30 years was proper and "a lot less than a life sentence." App. 2026.

## II[1]

On appeal, Ortiz challenges the admission of testimony as to the content of the lost recordings, the admission of the just over $2 million as intrinsic evidence of the conspiracy, and the Court's sentence. We address each argument in turn.

## A

Ortiz first claims the District Court's decision to permit Agents Gimbel and Pedrini to testify about what they saw on the lost recordings violated Rule 403 of the Federal Rules of Evidence. Because the District Court's decision to admit the evidence was not "arbitrary, fanciful, or clearly unreasonable," *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)), we disagree.

The agents' testimony was admissible secondary evidence, *see* Fed. R. Evid. 1004 & advisory committee's note to 1972 proposed rules, and had significant probative value. As Ortiz notes, the testimony placed him and/or his vehicle at the Rodriguez garage.

---

[1] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

Accordingly, it was admissible because it supported the notion that Ortiz was involved in the Rodriguez drug conspiracy.

Ortiz nevertheless argues that the agents' testimony lacked probative value because it was infected by hearsay. The District Court recognized that the agents' "reports incorporat[ed] information from other law enforcement agents," and for that reason restricted the agents' testimony to "only what each [had] personally observed." App. 8. Contrary to Ortiz's assertions, this restriction was not lifted at trial, even when the District Court clarified its pretrial ruling and allowed the agents to testify to their personal recollections of the lost recordings for days in which they had not written a report. Nothing in the Court's clarification permitted the agents to convey hearsay to the jury or rely on the reports of other agents instead of their own personal observations—a fact the Court explicitly noted when addressing this challenge during trial. *See* App. 781 (raising concerns about agents testifying to "the observations or comments of others" and finding the Government's response that the agents would testify only to their "personal observations" sufficient). Because the Court directly addressed the potential for hearsay, nothing in the Court's rulings permitted hearsay, and Ortiz could have ferreted out any potential hearsay on cross-examination but can point to no such statement, we reject his argument that hearsay infected the agents' testimony.[2]

---

[2] Ortiz claims hearsay was admitted on two occasions, but we disagree. As to Gimbel's testimony regarding January 24, he merely stated that his *report* was based on input from other agents and responded to defense counsel's questions on the matter. App. 1644–46. He goes on to state that he knew which parts of his report arose from his personal observation and that he could only testify to those events. App. 1645–46. Similarly, there was no hearsay in Gimbel's testimony as to the events of February 3. At

7

In terms of unfair prejudice, the loss of the recordings did not unduly hamper Ortiz's ability to cross-examine the agents. When they were testifying from their reports alone, the defense had the reports to aid in cross-examination. And when the agents testified as to their personal recollections from reviewing the tapes previously, the agents were subject to cross-examination like any other eyewitness—they saw an event unfold, there was neither video nor DEA-6 corroboration of their story, and the quality and accuracy of their perceptions were subject to attack by the defense.

Nor was there a significant risk that the jury was confused as to the source of the testimony it was hearing. As the Government argues, the jury was properly informed of the source of the agents' testimony—whether it was from live surveillance, the intact recordings, the lost recordings, or from a refreshed recollection of the lost recordings. *See, e.g.*, App. 714, 738–40, 786–87, 1396–97, 1403. And to the extent Ortiz believed the jury was confused as to the source of this testimony, he had ample opportunity to cross-examine the agents on the basis of their testimony. *See, e.g.*, 939–40. This was sufficient to combat the risk of jury confusion. *Cf. Gacy v. Welborn*, 994 F.2d 305, 313 (7th Cir. 1993) ("[T]he ability of jurors to sift good evidence from bad is an axiom of the system . . . .").

Finally, we are not persuaded by Ortiz's contention that the agents' testimony may have been opinion testimony that was not rationally related to their perceptions. Here, the

_____

that point, the jury was informed that Gimbel was testifying as a summary witness, *see* App. 1555–56, and there was no impropriety in summarizing events other agents had testified to. *See* Fed. R. Evid. 1006; *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C. Cir. 1987); *United States v. Velasquez*, 304 F.3d 237, 240 (3d Cir. 2002).

8

agents claimed to be testifying to their perceptions of the lost recordings. That the agents viewed the events on a recording rather than in person does not, without more, transform their personal observations into lay opinion.

In sum, when we consider the probative value of the agents' testimony together with all of the alleged sources of unfair prejudice asserted by Ortiz, we find the District Court did not abuse its discretion under Rule 403 in admitting the evidence.[3]

B

Ortiz also contends the District Court erred in finding the seizure of just over $2 million conditionally relevant as intrinsic evidence of his crimes. *See* Fed. R. Evid. 104(b); *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010). We review the District Court's evidentiary rulings for abuse of discretion and its underlying legal conclusions de novo. *Id.* at 239.

First, Ortiz argues that the evidence did not "directly prove[]" the Rodriguez-Ortiz conspiracy alleged in the indictment because the money was seized while it was being used by Ortiz to pay individuals unaffiliated with the conspiracy (*i.e.*, Ortiz's suppliers). *See Green*, 617 F.3d at 248–49. Not so. Once it can be determined that the money arose from a payment from Rodriguez to Ortiz, it constitutes direct evidence of their conspiracy. The fact that the money may have been seized while in use for another

---

[3] Ortiz relies heavily on *United States v. Brown*, 2009 WL 2338112 (W.D. Pa. July 29, 2009), to argue the agents' testimony should have been excluded. While somewhat factually similar, we find that case distinguishable because the matter of jury confusion has been adequately addressed here, the evidence in this case is not cumulative, and at least in instances where the agent wrote a report, it was written contemporaneously.

9

conspiracy or crime does not change this analysis. The cash itself was admissible, as it provided direct evidence that Rodriguez and Ortiz had a relationship in which Ortiz was paid large sums for supplying cocaine.

Second, Ortiz lodges a series of arguments targeting the conditional relevance of the seized money on the basis that it was not sufficiently linked to him. We find no abuse of discretion in the District Court holding that there was "sufficient evidence to allow the jury to find that the cash . . . was [Ortiz's], and that . . . [it] directly proves the conspiracy" based on the following: (1) the money was seized within four days of Ortiz receiving payments totaling $1.9 million from Rodriguez; (2) Ortiz told Rodriguez he needed to lie low "because the truck had been stopped;" and (3) Ortiz proceeded to step away from the drug business for a time. App. 19, 1125–26. These facts suggest that the money seized was derived from the conspiracy because the amount is quite similar and Ortiz saw fit to tell Rodriguez about "the truck" seizure and his decision to lay low after the seizure occurred. To be sure, Ortiz has arguments to the contrary: that the value of the seized money was not identical to the amount he was paid; that Ortiz had taken a break from supplying Rodriguez in the past; that he may have heard of the seizure from elsewhere and decided to lay low as a precaution; that the packaging on the money did not match how Ortiz normally wrapped his cash; and that the individuals found with the money were not prosecuted alongside Ortiz. But the fact that Ortiz has some plausible facts in support of his argument does not diminish the equally or more plausible facts supporting the Government's theory. The fact that both sides have good arguments makes this a classic judgment call by the District Court that warrants deference on appeal.

10

Accordingly, we hold that the District Court did not abuse its discretion in finding the money conditionally relevant. *See Huddleston v. United States*, 485 U.S. 681, 689–90 (1988).[4]

C

We turn finally to Ortiz's argument that his below-Guidelines sentence is unreasonable. He contends that the District Court procedurally erred by failing to adequately respond to his request for a variance due to his diminished life expectancy, and that the Court deprived him of due process by misapprehending the relevant facts of his health when imposing a sentence that mirrored his statistical life expectancy. We disagree.

The Court adequately responded to Ortiz's request for a variance when it stated: "I'm also denying the motion [for a variance] based on your diminished life expectancy based on Type II diabetes." App. 2025. The fact that the response was terse does not render the denial unreasonable, especially because Ortiz's argument for a variance was "conceptually simple." *See Rita v. United States*, 551 U.S. 338, 358–59 (2007) (upholding a sentence as procedurally reasonable where the court rejected a request for a sentence reduction because the Guidelines recommended sentence was "appropriate"); *United States v. Jackson*, 467 F.3d 834, 842 (3d Cir. 2006) (upholding the denial of a

---

[4] This evidence also was properly admitted under Federal Rule of Evidence 403. The seized money had high probative value as it provided direct evidence of drug dealing between Rodriguez and Ortiz. The fact that the seizure was one of unprecedented size, a fact elicited by defense counsel on cross-examination, was not so inflammatory as to unfairly prejudice Ortiz, especially given the large amount of money and drugs involved in the case.

11

variance as procedurally reasonable where the Court merely stated it had "considered" the defendant's request for a variance based on "upbringing, including [the defendant's] parents' drug addiction, and [his] financial circumstances"). Here, the record indicates that the Court listened to and considered Ortiz's request, but found it unwarranted.

Turning to Ortiz's second challenge to his sentence, a review of the record shows that the Court did not misapprehend facts prior to sentencing Ortiz. Counsel argued: "a 30-year sentence is greater than a life sentence based on Mr. Ortiz's medical conditions" and due to his Type II diabetes "a 25-year sentence, [is] all but . . . a life sentence." App. 2012, 2016. Given that these statements were made immediately before the Court imposed Ortiz's sentence, we find it implausible that the Court misapprehended these clear statements in sentencing Ortiz to 30 years' imprisonment. To be sure, the Court stated that the sentence was "a lot less than life," despite levying a sentence that (given good behavior) could leave Ortiz with about a year to live upon release given his estimated life expectancy. App. 2026; Ortiz Br. 53–54. But the fact remains that if Ortiz lives as long or longer than current medical statistics suggest, he will serve less than a life sentence.

III

For the reasons stated, we will affirm Ortiz's judgment of conviction and sentence.

12