**Walter L. THOMAS, Petitioner,**

v.

**Richard B. GRAMLEY, Warden, Pontiac Correctional Center, Respondent.**

No. 95 C 5039.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 10, 1996.

Mark Anthony Latham, Gardner, Carton & Douglas, Chicago, IL, Marshall J. Hartman, Chicago, IL, for petitioner.

Arleen C. Anderson, Penelope Moutoussamy George, Attorney General's Office, Chicago, IL, for respondent.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge:

Walter L. Thomas petitions for a writ of habeas corpus, 28 U.S.C. § 2254, raising several grounds in support of overturning his convictions, returned after a jury trial in Illinois state court, and the resulting death sentence. Primarily, he argues that his counsel provided ineffective assistance at the capital sentencing phase of the state trial court proceedings. For the reasons we discuss below, we deny the petition.

### I. Background

In March 1988, after a jury trial, the petitioner was convicted of murder, aggravated arson, arson, and burglary. At trial, the State offered evidence to prove the following facts.[1] On November 26, 1986, Thomas's job with a cleaning company landed him at the Aurora, Illinois home of Sophie Darlene Dudek. Dudek was in the business of selling perfume, and she stored a large quantity of the merchandise in her garage. According to Thomas's confession, he entered her garage, opened a perfume bottle, and decided to take it. However, Dudek then entered the garage, and according to Thomas, she tried to prevent him from leaving. Thomas then used a knife he was carrying to repeatedly stab Dudek; she died instantly after one of the stabs severed her spinal cord. To cover-up the crime, Thomas poured perfume on the victim, in her car, and throughout the garage, and started a fire. An investigation by the Aurora police led to Thomas's arrest.

---

1. Prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214, the presumption of correctness of state court factual findings, and the exceptions to this general presumption, were statutorily grounded in 28 U.S.C. § 2254(d). Currently, the presumption of factual correctness in habeas proceedings is codified at § 2254(e)(1) (as amended), and we apply the current version to this case because this provision does not " 'attach[ ] new legal consequences to events completed before its enactment.' " *Lindh v. Murphy,* 96 F.3d 856, 863 (7th Cir.1996) (en banc) (quoting *Landgraf v. USI Film Prods.,* 511 U.S. 244, ——, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994)), *pet. for cert. filed,* No. 96–6298 (Oct. 10, 1996). We garner the facts found at trial from the Illinois Supreme Court opinions addressing the petitioner's direct and post-conviction appeals. *People v. Thomas,* 164 Ill.2d 410, 207 Ill.Dec. 490, 647 N.E.2d 983 (1995); *People v. Thomas,* 137 Ill.2d 500, 148 Ill.Dec. 751, 561 N.E.2d 57 (1990).

After the jury found Thomas guilty, the state court held a sentencing hearing, which concluded with the same jury voting to impose the death penalty for the murder conviction. In 1990, the Illinois Supreme Court upheld the conviction and death sentence, *People v. Thomas,* 137 Ill.2d 500, 148 Ill.Dec. 751, 561 N.E.2d 57 (1990) (*Thomas I*), and Thomas then unsuccessfully sought post-conviction relief in state court. In 1995, the Illinois Supreme Court affirmed the denial of post-conviction relief. *People v. Thomas,* 164 Ill.2d 410, 207 Ill.Dec. 490, 647 N.E.2d 983 (1995) (*Thomas II*). Presently before this court is Thomas's petition for a writ of habeas corpus, in which he designates numerous grounds for overturning the conviction and death sentence. After discussing under what circumstances an erroneous state court decision authorizes issuance of a writ of habeas corpus, we address the arguments in turn.

## II. Section 2254(d)(1)

As amended by Chapter 153 of the Antiterrorism and Effective Death Penalty Act, § 2254 contains a new subsection that provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1), (2). In *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996) (en banc),[2] the Sev-

enth Circuit decided that the Act does not directly specify whether Chapter 153 applies to pending cases,[3] and thus, after rejecting the argument that § 2254(d) would operate retroactively if generally applied to pending cases, concluded that § 2254(d) is presumptively applicable. *Id.* at 863–65. The Seventh Circuit then held that applying § 2254(d) to the petitioner in *Lindh* would not attach new legal consequences to events prior to the Act's signing. *Id.* at 865–67. In accordance with *Lindh,* and because Thomas fails to identify relevant events or actions specific to him to which the Act would attach new legal consequences, we must apply § 2254(d) in reviewing Thomas's petition.

Section 2254(d)(1) in pertinent part forbids granting a writ of habeas corpus based on a claim decided in state court unless the decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or was "an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States." *Lindh* interprets the first clause to provide guidance to a state court when answering legal questions; the clause dictates the *source* of legal principles and the *clarity* with which those principles must be established. In answering legal questions, a state court must follow "legal principles articulated by the *Supreme* Court," *id.* at 870 (emphasis added)—not those legal rules whose "real" source is a lower federal court, *id.* at 869—and a state decision must comply with "clearly established" principles, *id.*

■ Similarly, when a state court answers a "mixed question of law and fact," that is, applies the law "to a particular set of facts," the state court must follow clearly established law explained by the Supreme Court, but a federal court may not issue the writ unless the state court's application is "unrea-

**2.** After *Lindh* was announced, we granted the petitioner's motion to brief the impact of the decision, and the resulting briefing schedule fixed November 14, 1996, as the filing date for the final brief in this case.

**3.** Section 107(c) of the Act does expressly state that Chapter 154, §§ 2261–66, applies to cases pending on the date of enactment. Although the

State in its Answer refers to Chapter 154's limitations periods on district and circuit courts to determine petitions filed by capital inmates, § 2266, the State does not argue that Illinois satisfies the conditions set forth in § 2261(b)–(d)—conditions a State must meet in order to invoke the additional provisions of Chapter 154, § 2261(a). Resp.'s Answer at 2–3.

sonable." *Id.* at 870. While the Seventh Circuit in *Lindh* acknowledged the difficulty in formulating a definition of "unreasonable," the court did suggest "that when the constitutional question is a matter of degree, rather than of concrete entitlements, a 'reasonable' decision by the state court must be honored. By posing the question whether the state court's treatment was 'unreasonable,' § 2254(d)(1) requires federal courts to take into account the care with which the state court considered the subject." *Id.* at 871.

■ We do not take *Lindh* to declare, however, that when we measure the state court's decision, either for adherence to clearly established law or for reasonableness in application, we are confined to the discussion or reasons that appear in the state court opinion. Prior to the passage of the Act, a federal court might disagree with the state court's reliance on specific cases or with some or all of the state court's articulated reasons for rejecting a particular claim advanced by the petitioner, and yet the federal court could still conclude that the petitioner was not "in custody in violation of the Constitution" by relying on different cases or by supplying different reasons. § 2241(c)(3). Similarly, in those instances where the state court did not refer to any authority or set forth any reasons in rejecting a fairly presented claim, the federal court entertaining the habeas petition remained free to go beyond the state court opinion and resolve the issue. Although *Lindh*'s interpretation of § 2254(d) instructs us "to take into account the care with which the state court considered the subject," 96 F.3d at 871, neither § 2254(d) nor *Lindh* indicates that we may examine *only* the state court's discussion. Section 2254(d) authorizes issuance of the writ only when the state court adjudication "resulted" in a "decision" of the kinds specified in § 2254(d)(1). And the court in *Lindh* itself examined a pure question of law not discussed by the Wisconsin Supreme Court's opinion. *Compare id.* at 874–76 (holding that state supreme court's "decision" was not contrary to clearly established law even though state supreme court did not address issue) *with State v. Lindh,* 161 Wis.2d 324, 468 N.W.2d 168 (1991) (no actual discussion of whether Confrontation Clause applies to dispositional phase of bifurcated trial). Similarly, when scrutinizing the state supreme court's answer to a mixed question of law and fact, the court in *Lindh* supplied an additional reason not mentioned in the state court opinion for concluding that the state court's decision was reasonable. *Compare* 96 F.3d at 977 (noting that there existed no evidence that psychiatrist changed diagnosis after purported motive for bias arose) *with* 468 N.W.2d at 177–83.

In sum, while we will independently interpret the Constitution, we cannot issue the writ unless the state court decision is contrary to law clearly established by the Supreme Court, § 2254(d)(1), or involves an unreasonable application of such law to the facts, § 2254(d)(2). But we remain free to look beyond those cases and reasons relied upon by the state court opinion in determining whether the standards for issuance of the writ set forth in § 2254(d)(1) have been met. With these principles in mind, we turn to Thomas's petition.

### III. Discussion

#### A. Ineffective Assistance of Counsel— Sentencing Phase

Thomas's primary claim is that his trial counsel, Harriet D. Gustafson, rendered ineffective assistance at the sentencing phase by failing to adequately present mitigating evidence.[4] In order to prevail on a claim of ineffective assistance, at a minimum the petitioner must show (1) counsel's representation at sentencing failed to meet an objective standard of reasonableness, and (2) a reasonable probability exists that, but for counsel's unprofessional representation, the result of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *Ebbole v. United States,* 8 F.3d 530, 533 (7th Cir.1993). Under the Illinois

---

4. The State does not argue that the petitioner's primary claim of ineffective assistance of counsel at sentencing was procedurally defaulted.

statute governing Thomas's capital sentencing proceeding, the jury could consider "any mitigating factors which are relevant to the imposition of the death penalty" in deciding whether the mitigating factors were sufficient to preclude the death sentence, Ill.Rev. Stat. ch. 38, ¶ 9–1(c), and one juror's vote against the death penalty could prevent a capital sentence, *see* ¶ 9–1(g); *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.1989). Among the nonexclusive list of mitigating factors is that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." ¶ 9–1(c)(2).

In identifying his trial attorney's failures to present mitigating evidence, the petitioner first argues that Gustafson failed to uncover evidence regarding his "serious psychological problems." Pet.'s Br. at 3–5.[5] Thomas refers mainly to a variety of mental and psychological evaluations generated in 1971–72 during his brushes with the juvenile court system. Pet.'s Exs. 10–24. As detailed at the sentencing hearing and described by the Illinois Supreme Court, Tr. 3523–33,[6] 207 Ill.Dec. at 499–500, 647 N.E.2d at 992–93, Thomas committed two aggravated assaults, an armed robbery, and an aggravated battery in 1969 and 1970.[7] Some of the evaluations do portray Thomas as "emotionally disturbed," Ex. 15, as having "a very real and serious psychological problem," Ex. 18, and perhaps a "schizoid tendency," Ex. 11. In addition, some evaluations noted that he "projected elements of conflict with the opposite sex," Ex. 11 at 2, "has developed some very bizarre feelings about women," Ex. 18, and "must be regarded as quite dangerous, specifically from a sexual point of view," *id.* As for the possibility that Thomas suffered from organic brain damage, while some evaluations voiced suspicions, Exs. 18, 21, 22, none definitively made that diagnosis, and others thought it unlikely, Exs. 11, 15, 16. Finally, evaluations placed Thomas's intelligence as a teenager at "low average," Ex. 10

at 1, or "dull normal," with intelligence quotients in the low 80s, Ex. 11 at 2, *see also* Ex. 12, 13, 15, 22.

In addition to these evaluations of Thomas while a teenager, the petitioner also submits reports written in 1992 by a neuropsychologist, Linda Wetzel, and a psychologist, Michael Levins. Wetzel fixed Thomas's IQ at 85, Ex. 8 at 2, and based on several tests, concluded that Thomas has "slowed mentation," "an effect of non-specific organic brain impairment," *id.* at 3. After reviewing the teenage evaluations, several affidavits from Thomas's family and friends, and other documents, and after interviewing the petitioner, Levins concluded that (1) Thomas had a diminished capacity for self-control, and even suffered from "Post Traumatic Stress Disorder" at the time of the murder, due to childhood abuse inflicted upon him by his mother, Ex. 7 at 5; (2) Thomas had a diminished capacity to know right from wrong due to his parents' encouragement of aggressive behavior, *id.* at 7–8; (3) "[i]t is quite possible" that Thomas suffers from a mental defect, *id.* at 8–9; (4) Thomas has a "very high potential" for rehabilitation, *id.* at 9; and (5) Thomas is not a danger to other prisoners, *id.* at 10.

Rather than investigate and present evidence that showed Thomas as psychologically disordered, his defense attorney took a different approach at the sentencing hearing. In a deposition taken for Thomas's state postconviction petition, Gustafson explained her mitigation strategy: prove that law enforcement officials had "promised his mother they were not going to kill him if he confessed to them. He confessed to them, and here are some people that can tell you about a Walter Thomas who was not a cruel, vicious person but a very kind, hard-working good person, so don't kill him." Gustafson Dep. at 19–20, 29 (Pet.'s Ex. 1). To those ends, Gustafson called Thomas's mother to testify about a police officer's promise of leniency,

---

5. We will refer to Thomas's submissions as follows: petition as "Pet."; Memorandum in Support of Petition for Writ of Habeas Corpus as "Pet.'s Br."; Reply Memorandum to State's Answer as "Pet.'s Reply"; Supplement Memorandum as "Pet.'s Supp."

6. We will use the serial pagination of the trial transcript as indicated by the stamp in the lower right corner of each transcript's page.

7. The petitioner was born on February 12, 1955. Presentence Report at 1 (filed Apr. 19, 1988).

Tr. 3584–86, and also presented witnesses who testified that Thomas worked diligently, volunteered at church functions, participated in community youth activities, and acted respectfully toward others. Tr. 3557–59 (testimony of cousin Mae Ellen Russell); Tr. 3562–66 (testimony of landlord Noreen Wallace). Additionally, a friend and former roommate, Issac Jackson, explained that Thomas dated a variety of women, and was "outgoing" and nonviolent. Tr. 3572. Thomas's former girlfriend, Karen Newton, also testified that she had never seen Thomas act violently towards her, her daughters, or anyone during the seven years that she knew him, including the approximately five years during which they lived together and up to the time of his arrest. Tr. 3577.

■ In assessing the competence of Gustafson's presentation of mitigation evidence, the Illinois Supreme Court adhered to "clearly established" legal principles determined by the United States Supreme Court. *See* 207 Ill.Dec. at 494–95, 498, 647 N.E.2d at 987–88, 991. Citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Illinois Supreme Court accurately identified the first inquiry: whether trial counsel's representation "f[e]ll below an objective standard of reasonableness." *Id.* at 498, 647 N.E.2d at 991. And even more specifically, the state supreme court relied on *Strickland* for the following principles:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.... And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with

the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066 (cited and quoted in part by *Thomas,* 207 Ill.Dec. at 498, 647 N.E.2d at 991).

More significantly, the Illinois Supreme Court's application of the governing law to the facts of Thomas's case—that is, the court's answer to a mixed question of law and fact, *see Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070—cannot be deemed "unreasonable." In Gustafson's deposition testimony—which the state courts credited and which the petitioner has failed to undermine [8]—she explained that discussions with Thomas, his mother, and Karen Newton regarding "emotional disturbance as a mitigating factor" indicated to her that there was none, Gustafson Dep. at 44; *Thomas II,* 207 Ill.Dec. at 498, 647 N.E.2d at 991, and according to the Illinois Supreme Court, Gustafson stated that Thomas and his mother "were very cooperative in his defense," *id.;* Gustafson Dep. at 33; *cf. id.* at 32, 30 (counsel spoke "numerous times" to Thomas's mother, who helped identify mitigation witnesses). Because Gustafson felt there was "no reason to believe" Thomas suffered from an emotional disturbance, no independent expert was hired to examine him. *Id.* at 45; *Thomas II,* 207 Ill.Dec. at 498, 647 N.E.2d at 991. Additionally, based on information provided by Thomas, the county circuit court's probation department prepared a presentence report that stated, "The defendant has never had any type of psychiatric or psychological testing, evaluation, [or] counseling." Presentence Report at 3, 6 (quoted by *Thomas II,* 207 Ill.Dec. at 498, 647 N.E.2d at 991).

■ In determining that counsel had not rendered constitutionally deficient assistance, the Illinois Supreme Court detailed, and relied on, these facts, as well as other considerations. 207 Ill.Dec. at 498, 647 N.E.2d at 991. Given the propriety of considering "the defendant's own statements or actions,"

---

8. Nor do we believe that the petitioner has proffered any basis for a new evidentiary hearing in this court. *See* § 2254(e)(2).

*Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066, when assessing Gustafson's investigation of Thomas's psychological history, the Illinois Supreme Court reasonably concluded that counsel performed competently. Thomas gave no indication to counsel that he was suffering, or had suffered, from a psychological disorder. Nor did his mother and former girlfriend—close supporters of Thomas— suggest that he had a psychological problem. Although the petitioner points out that a mitigation report prepared for the sentencing noted that he "had difficulty with dates and time sequencing," spent his childhood in a troubled home, and had problems with both oral and written expression while a student, Pet.'s Br. at 6, Gustafson's own face-to-face conversations with Thomas and his mother led her to accept their denials of any past or present emotional disturbance. Rather than an emphasis on Thomas's dismal adolescence, counsel's discussions with Thomas and potential mitigation witnesses pointed to an entirely different mitigation strategy: portrayal of Thomas as a well-adjusted, productive member of society. Under *Lindh*'s construction of § 2254(d)(1), *regardless of our plenary view of the reasonableness of counsel's performance, we may grant the writ only if we could deem the Illinois Supreme Court's de-

cision unreasonable.[9] After reviewing the law, facts,[10] and reasons discussed in *Thomas II*, we conclude that the state supreme court reasonably decided that counsel's investigation of Thomas's psychological history did not fall below an objective standard of reasonableness.[11]

Likewise, the Illinois Supreme Court reasonably applied the law to the facts underlying the petitioner's other claims attacking counsel's performance at sentencing. Aside from the argument concerning the failure to investigate Thomas's psychological history, the petitioner contends that counsel should have investigated and presented evidence showing that Thomas's parents, including his alcoholic father, physically abused him. Pet. at 16; Pet.'s Br. at 8. The Illinois Supreme Court's discussion of this contention pointed out that the state trial court "found that '[a]ll sources of information reveal that the Defendant came from a supportive family.'" 207 Ill.Dec. at 500, 647 N.E.2d at 993. Additionally, the Illinois Supreme Court referred to Thomas's presentence report; based on an interview with Thomas, the report stated, "The defendant described a family that was very 'close knit and supportive.'" Presentence Report at 7 (quoted by 207 Ill.Dec. at 500, 647 N.E.2d at 993).[12] Although it is not

---

9. Where, as here, a petitioner argues that he received ineffective assistance of counsel, § 2254(d)(1) adds another layer of reasonableness in inquiring whether habeas relief is justified; that is, we no longer merely examine the reasonableness of counsel's performance, we ask whether the state court reasonably answered the mixed question of law and fact. In this action, we need not decide *de novo* the merits of the underlying constitutional claim because we conclude that the state court reasonably rejected the ineffective assistance of counsel claim. In other cases, it seems that it may be more appropriate to decide the underlying claim *de novo* rather than examine the reasonableness of the state court's application of the law to the facts. *Cf. Henderson v. DeTella,* 97 F.3d 942, 943 n. 1 (7th Cir.1996). This operation of § 2254(d)(1) is roughly similar to other situations in which a court may either address the merits of the underlying constitutional claim or instead resolve a question that is only indirectly related to the underlying claim's merits. *Cf. Anderson v. Creighton,* 483 U.S. 635, 643–44, 107 S.Ct. 3034, 3040–42, 97 L.Ed.2d 523 (1987).

10. We need not agree with the state supreme court's assertion that Thomas and his mother "lied" about his psychological history, *Thomas,*

207 Ill.Dec. at 498, 647 N.E.2d at 991, that is, intentionally misrepresented information about evaluations conducted fifteen years or so prior to the crime, in order to decide that the court reasonably concluded that Gustafson was not constitutionally required to investigate further.

11. Our conclusion obviates the need to determine whether there existed a reasonable probability that, but for the allegedly incompetent representation, the sentencing hearing would have resulted in a different outcome. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70.

12. The State argues that counsel stated in her deposition "that Petitioner, his family, and his girlfriend ... were cooperative with her throughout the proceedings. *According to them, Petitioner came from a supportive, close knit family....*" Resp.'s Br. at 7 (emphasis added). To our disappointment, the State cites no evidence for this proposition, and we cannot locate where in counsel's deposition she made this purported assertion. We expect all litigants, and especially those in capital sentence litigation, to support such important factual assertions with accurate citations to the record.

clear whether the state supreme court was simply affirming the trial court's factual finding that the petitioner's family was supportive, the pertinent holding[13] is the Illinois Supreme Court's rejection of the argument that counsel was ineffective because "trial defense counsel failed to investigate and present other key mitigation facts." 207 Ill. Dec. at 500, 647 N.E.2d at 993. We cannot deem that holding unreasonable for reasons similar to our rejection of the petitioner's attack on counsel's investigation of his psychological history. Again, counsel received no indication that further investigation into Thomas's family life would have yielded mitigation evidence; indeed, the evidence available to Gustafson led her to portray Thomas in a positive light.

Next, the petitioner complains that counsel failed to inform the jury that he is "the loving father of a young daughter." Br. at 8. However, as the Illinois Supreme Court emphasized, Thomas told Gustafson "that he didn't want [the mother of his child] to testify." Gustafson Dep. at 33; 207 Ill.Dec. at 500, 647 N.E.2d at 993. Accordingly, the state supreme court's rejection of this argument was reasonable.

In addition, Thomas maintains that counsel failed to investigate and discover other obstacles he faced while a child, specifically, living in a poverty-stricken, gang-ridden neighborhood. Br. at 8. However, although the petitioner directed the Illinois Supreme Court's attention to the alleged child abuse he suffered, Thomas failed to advance any argument concerning his family's low-income status and neighborhood. *See* Pet.'s Postconv.App.Br. at 13 (Resp.'s Ex. C–2); Pet.'s Postconv.App.Reply Br. at 8–9 (Resp.'s Ex. C–3). Accordingly, the Illinois Supreme Court considered neither this argument nor the alleged supporting facts, and we will not now consider this defaulted ground.

In sum, we conclude that the Illinois Supreme Court's rejection of the petitioner's ineffective assistance at sentencing claim was consistent with clearly established legal principles and did not involve any unreasonable applications of the governing law to the facts. Thomas's arguments as to purported failures to investigate were reasonably rejected by the state supreme court, as were Thomas's contentions that counsel had failed to develop a mitigation strategy, and that counsel's purported missteps cumulatively constituted ineffective assistance. Accordingly, the petitioner's claim of ineffective assistance of counsel at sentencing does not provide a ground for habeas relief.

### B. Prosecutorial Misconduct at Sentencing

Thomas next argues that his death sentence should be overturned because the prosecutor allegedly made impermissible racial remarks during the sentencing hearing; the petitioner is a black male and the victim was a white woman. Primarily, the petitioner emphasizes the following remarks made during the prosecutor's opening statement at the sentencing hearing:

> And Detective Langston, one of the things that he will tell you, he questioned Walter Thomas as regarding the prior sexual offenses and he told Walter Thomas, one or both of these cases with young women, just like Nancy T[.], and both those cases *young white women* and both of those cases involved kni[v]es.

Tr. 3416 (emphasis added) (quoted by Pet.'s Br. at 15). According to the petitioner, the "reference to 'young white women' was an obvious attempt to incite any covert or overt racial prejudices that the all-white jury may have harbored." Pet.'s Br. at 15. Additionally, the petitioner points to various Department of Corrections documents, generated in the early 1970s, relating to Thomas's juvenile convictions that described him as "male black," Tr. 3504, "male Negro," Tr. 3527, and "male colored," Tr. 3531.

Rather than directly address this claim on the merits, however, the Illinois Supreme Court held that Thomas "waived" the claim by failing to object at sentencing. *Thomas I*, 148 Ill.Dec. at 769, 561 N.E.2d at 75. Generally, when a state court refrains from ad-

---

**13.** It appears that the petitioner casts his argument on this issue as one of deficient performance, rather than a challenge of the state supreme court's affirmance of the factual finding. Pet. at 16; *see* Br. at 7–8.

dressing the merits of a federal claim because the petitioner failed to follow a state procedural requirement, the claim cannot form the basis for federal habeas relief unless the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).[14] Thomas proffers, as cause for the failure to object to the prosecutor's remarks, the ineffective assistance of his trial counsel, Pet.'s Reply Br. at 16–17, a ground that does constitute a plausible basis for cause, *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). As the petitioner acknowledges, however, the exhaustion doctrine "generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id.* at 489, 106 S.Ct. at 2646. In his reply brief, Thomas maintains that he did exhaust this claim because he raised ineffective assistance of counsel in his state court postconviction petition, and in support cites (without directing us to specific pages) to the Illinois Supreme Court opinion affirming the denial of the petition. Pet.'s Reply Br. at 17.

■ However, that he presented *some* claims of ineffective assistance of counsel does not mean he presented the failure to object to the prosecutor's remarks as ineffective assistance. Indeed, an examination of the postconviction petition reveals that he did not present this specific claim to the state courts. *See* Postconv.Pet. at 30–35 (discussion of ineffective assistance during sentenc-

ing), 38–41 (discussion of prosecutor's racial remarks). Thus, we cannot accept Thomas's explanation for why the ineffective assistance claim proffered as cause is exhausted. Instead of presenting the claim to the state courts, Thomas did exactly the opposite: he did not present as ineffective assistance the failure to object to the racial remarks on direct appeal and in the postconviction petition. So the petitioner procedurally defaulted the ineffective assistance claim both on direct appeal and in the postconviction proceeding, *see Coleman*, 501 U.S. at 735 n. 1, 111 S.Ct. at 2557 n. 1; *Cawley v. DeTella*, 71 F.3d 691, 694 (7th Cir.1995) (if state court would deem claim procedurally defaulted, then default bars federal habeas review of that claim); 725 ILCS 5/122–3 ("Any claim of substantial denial of constitutional rights not raised in the original or amended petition is waived."); *People v. Free*, 122 Ill.2d 367, 119 Ill.Dec. 325, 329, 522 N.E.2d 1184, 1188 (1988) (relying on § 122–3 to preclude review of claim not included in first post-conviction petition), and thus cannot now employ the ineffective assistance claim as cause for defaulting the prosecutorial misconduct claim, unless Thomas can show cause for his defaults of the ineffective assistance claim (a requirement additional to showing cause for defaulting the prosecutorial misconduct claim), *Lemons v. O'Sullivan*, 54 F.3d 357, 360–61 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 528, 133 L.Ed.2d 434 (1995). But the petitioner does not offer any cause for procedurally defaulting the ineffective assistance claim based on trial counsel's failure to object to the remarks. Accordingly, counsel's failure to object cannot constitute cause for defaulting the prosecutorial misconduct claim, and that claim is procedurally defaulted.[15]

---

14. We reject at the outset Thomas's suggestion that Illinois's procedural default rule violates due process when applied to his prosecutorial misconduct claim.

15. We note that the petitioner fails to argue that the Illinois Supreme Court did address the merits under federal constitutional law of his challenge to the prosecutor's racial remarks when the court reviewed the remarks for "plain error." *Thomas I*, 148 Ill.Dec. at 769, 561 N.E.2d at 75. At times it is unclear whether a state court is relying on the independent and adequate state procedural default to reject a claim or is instead

basing the decision on federal law. To minimize the costs of scrutinizing state court opinions, we generally presume that "if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *Coleman*, 501 U.S. at 735, 111 S.Ct. at 2557 (footnote omitted). Determining whether the Illinois Supreme Court's plain error review "fairly appear[s]" to be a decision on the

### C. Ineffective Assistance of Counsel at Trial

Aside from contending that counsel was ineffective at the sentencing stage of the proceedings, Thomas separately argues that counsel rendered ineffective assistance during the innocence-guilt phase of the trial. Primarily, the petitioner complains that counsel failed to recognize the "racial aspects" of the case—that is, the murder of "a white woman by a black man," Pet. at ¶ 82(C)—and more specifically, (1) did not make any "*Batson* type" objection based on the ground that the venire contained no blacks or other minorities," *id.* at ¶ 82(A); and (2) inadequately questioned prospective jurors "to prevent racial bias from infecting the trial," *id.* at ¶ 82(C).

■ The Illinois Supreme Court rejected these claims by holding that, even if these alleged failures constituted incompetent representation, the errors did not prejudice Thomas because the evidence of guilt was "overwhelming":

> Defendant was placed at the crime scene and admitted to several persons that he had previously been in the victim's garage to take items stored there. Defendant had a substance on his vest that an expert opined was type B blood, the same as the victim's and different from defendant's. Defendant also gave two oral confessions and a written confession, and confessed and apologized to his mother in the presence of a witness.

*Thomas II*, 207 Ill.Dec. at 496, 647 N.E.2d at 989. Applying the prejudice requirement as explained in *Strickland*, the state supreme court concluded that the outcome of the proceedings would not have been different if counsel had recognized any racial tensions in the case. *Id.* We cannot conclude that this application of the governing law to the facts was unreasonable. In addition to the evidence against the petitioner, counsel actually did ask several prospective jurors about their experiences with blacks, including eight of the jurors actually sworn onto the petit jury.[16] Moreover, Thomas does not have any actual evidence, systemic in DuPage County or particular to his jury, that racial bias played such a prominent role in the trial that our confidence in the outcome should be undermined or that the Illinois Supreme Court's conclusion was unreasonable.

■ Nor would we deem counsel's performance regarding the "racial aspects" of the case as incompetent. The worthiness of Thomas's proposed "*Batson* type" objection is unclear: in *Batson*, the Supreme Court held that the state prosecution's use of peremptory challenges based on race is a violation of the Equal Protection Clause. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). However, Thomas makes no claim based on the prosecution's exercise of peremptories. Rather, the petitioner complains that the venire was entirely white, but makes no attempt to show that counsel should have expected an equal protection, fair cross-section, or some other challenge to the county's method of drawing jurors to be successful. Furthermore, we will not deem counsel incompetent merely because she did not ask a race relations question of every prospective juror or because she viewed the case as more of a straight murder case than one laced with racial tension, Gustafson Dep. at 74–75. Those judg-

---

merits requires an examination of the role of Illinois' plain error review in general and the decision of the court in particular, *see Willis v. Aiken*, 8 F.3d 556, 566–67 (7th Cir.1993); *compare Neal v. Gramley*, 99 F.3d 841, 843–44 (7th Cir.1996) *with U.S. ex rel. Balderas v. Godinez*, 890 F.Supp. 732, 745–46 (N.D.Ill.1995) (plain error analysis by Illinois Appellate Court on a particular issue raised by the petitioner appeared to rest on federal law). Because the petitioner does not discuss this argument to escape procedural default, we will not conclusively address the issue, although we note that the state supreme court's plain error analysis appeared, as it usually does, to rely on state law regarding the prejudicial effect of the remarks, rather than federal law. *Thomas I*, 148 Ill.Dec. at 769, 561 N.E.2d at 75 (citing *People v. Johnson*, 114 Ill.2d 170, 102 Ill.Dec. 342, 345, 499 N.E.2d 1355, 1368 (1986)).

16. All together, counsel asked fourteen prospective jurors about their experiences with blacks. Tr. 1493, 1519–20, 1529 (juror sworn), Tr. 1540–41 (juror sworn), Tr. 1568 (juror sworn), Tr. 1589–90, 1591 (juror sworn), Tr. 1607, Tr. 1621–22 (juror sworn), Tr. 1674 (juror sworn), Tr. 1686 (juror sworn), Tr. 1763 (juror sworn), Tr. 1733–34 (juror sworn, then excused), Tr. 1802–03.

ment calls fell within the range of reasonable professional representation.

In addition, Thomas labels other facets of counsel's performance as missteps constituting ineffective assistance of counsel. First, the petitioner argues that counsel altogether failed to develop a jury selection strategy, Pet. at ¶ 82(B), but this particular claim was not presented to the Illinois Supreme Court on postconviction appeal, *see* Pet.'s Postconv.App.Br. at 7–8; Pet.'s Postconv.App.Reply Br. at 6–7, and thus was procedurally defaulted.[17] Next, the petitioner contends that counsel failed to object to the State's "persistent mischaracterization of the stains on Mr. Thomas's vest as blood." Pet. at ¶ 82(D). However, on postconviction appeal, the Illinois Supreme Court deemed this claim waived because Thomas did not raise it on direct appeal, when he was represented by a different lawyer, *Thomas II,* 207 Ill.Dec. at 496, 647 N.E.2d at 989, and the petitioner does not proffer any cause for the procedural default. On a related issue, Thomas also faults counsel for failing "to retain a forensic expert to review and testify regarding the validity of the State's ABO testing and electrophoretic testing of the stains." Pet. at ¶ 82(E). If Thomas means by this argument that counsel should have hired a forensic expert to examine the stains, then we must reject the claim because on postconviction the Illinois Supreme Court actually held this contention waived, again because it was not raised on direct appeal. 207 Ill.Dec. at 496, 647 N.E.2d at 989. Alternatively, if Thomas means that counsel should have hired a forensic expert to attack the validity of the State's stain-testing methods, then we must too reject the claim because an Illinois state court *would* deem the argument waived for the same reason—the claim could have been, but was not, raised on direct appeal.

Next, Thomas assails trial counsel's failure to impeach the testimony of his work super-

visor, who testified for the State and placed Thomas at the victim's building on the date of the murder. Several months after Thomas's trial, his supervisor apparently committed suicide. Pet.'s Ex. 6. In a case report filed by the Office of the Cook County Medical Examiner, an investigator states that he "learned through police that the subject has two previous arrest[s] for criminal sexual assault." *Id.* at 2. Even if the hearsay contained in the case report was sufficient to establish that the supervisor had indeed been arrested prior to the petitioner's trial, Illinois law generally does not permit prior arrests to constitute impeachment evidence in the way prior felonies may be used to impeach, and the petitioner does not argue that the arrests were relevant as impeaching evidence in any other way. *See People v. Driskell,* 213 Ill.App.3d 196, 156 Ill.Dec. 914, 917, 571 N.E.2d 894, 897 (1991).

Finally, the petitioner complains that trial counsel failed to object at a specific point in the direct examination of Robert Cummins, a criminal investigator in private practice whom the Aurora Police Department had asked for assistance. Cummins testified that, after Thomas confessed, Thomas indicated that he wanted to confess to his mother, and Cummins overheard Thomas tell her, "I did this." Tr. 2565–66. According to the petitioner, trial counsel should have objected to this answer because Cummins had testified at a preliminary hearing that Thomas told his mother, "I'm sorry." Tr. 2568. However, this claim too was not raised on direct appeal, and the Illinois Supreme Court held on postconviction appeal that it was waived. *Thomas II,* 207 Ill.Dec. at 497, 647 N.E.2d at 990. Thomas fails to proffer any cause for the default, and we accordingly will not grant relief on this claim.[18] In sum, the petitioner's counsel did not render ineffective assistance of counsel at trial, regardless of whether the purported missteps properly

---

17. We point out that trial counsel did generally try "[t]o find out as much about the people as I could to make a judgment call as to whether we wanted to keep them on the jury and find out what their attitudes were about the death penalty." Gustafson Dep. at 69.

18. In any event, trial counsel's failure to object did not constitute ineffective assistance of counsel: counsel did in fact elicit on cross-examination the concession, Tr. at 2568, and indeed it actually appears that Cummins testified at the preliminary hearing that Thomas said to his mother *both* "I did it" and "I'm sorry," *id.*

preserved for habeas review are viewed individually or in combination.

### D. Ineffective Assistance of Trial Counsel—Lack of Experience

■ Thomas's fourth ground for relief contends that trial counsel was unconstitutionally ineffective *per se* because she had never before served as lead counsel in a murder case and had never had any experience in representing a defendant charged with a capital crime. Pet. at ¶¶ 86–90. According to the petitioner, this lack of experience "fails to meet the recommended standards for trial defense counsel in capital cases promulgated by the American Bar Association and the National Legal Aid & Defender Association. Pet.'s Br. at 18. We reject, however, the suggestion that failure to adhere to those recommendations by itself constitutes ineffective assistance of counsel. Such bar association standards "are guides to determining what is reasonable, *but they are only guides.*" *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065 (emphasis added). In addition, although we evaluated counsel's performance while keeping in mind her experience, "[t]he character of a particular lawyer's experience ... does not justify a presumption of ineffectiveness in the absence of such an evaluation." *United States v. Cronic,* 466 U.S. 648, 665, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984). Standing alone, then, the mere fact that Thomas was Gustafson's first murder and capital client does not automatically render her representation constitutionally ineffective.[19]

### E. Extreme Emotional Disturbance

■ Petitioner next argues that, because the jury at sentencing did not consider the mitigation evidence concerning his alleged emotional problems, the sentence of death violates his Sixth Amendment right to a jury, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth Amendment right to due process. Pet. at ¶¶ 91–97; Pet.'s Br. at 19. It is true that the Eighth and Fourteenth Amendments require the state to permit the capital

sentencing authority to consider the individual circumstances surrounding the defendant and the offense. *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). But the State did not prevent Thomas from presenting such evidence; we have already rejected as grounds for relief the only possible conduct that might have been attributable in this case to the State, constitutionally ineffective assistance of counsel. Nor does Thomas cite any support for his proposition that the Constitution is violated whenever a capital sentencing authority is not presented with all the mitigation evidence that exists for a particular defendant, regardless of *why* the evidence was not presented. In effect, the petitioner demands a constitutional guarantee of a perfect capital sentencing proceeding. No such guarantee exists, and we thus reject this claim as a basis for relief.

### F. Illinois Pattern Jury Instruction

Thomas next directs our attention to the Illinois Pattern Instructions provided to the jury for its capital sentencing deliberations and argues that the instructions "failed to adequately guide" the jury's life or death decision. Pet. at ¶¶ 98–103, Ex. 43; Pet.'s Br. at 19–20. According to the petitioner, the pattern instructions cause a substantial number of jurors to misunderstand certain aspects of Illinois's capital sentencing scheme, such as whether jurors may consider mitigating factors unenumerated in the statute and whether jurors must be unanimous in determining the existence and weight of mitigating factors. In support of this claim, Thomas submits an affidavit and report by Professor Shari Seidman Diamond, who conducted a study in November and December 1994 to supplement an earlier study by the late Professor Hans Zeisel. The Diamond Study purports to correct the "fatal flaws" in the Zeisel Study perceived by the Seventh Circuit in *Gacy v. Welborn,* 994 F.2d 305, 311–14 (7th Cir.1993), and *Free v. Peters,* 12 F.3d 700, 705–06 (7th Cir.1993), specifically, that the Zeisel Study lacked comparability between a test setting and a sentencing hear-

---

**19.** We take care to refrain from implying that we disagree with the bar association guidelines, even though the Sixth Amendment does not require

implementing them. *Cf. Cronic,* 466 U.S. at 665 n. 38, 104 S.Ct. at 2050 n. 38.

ing setting, and that the study failed to test whether an alternative set of instructions would improve comprehensibility. To more closely mimic a real sentencing hearing, the Diamond Study provided an audiotaped description of the evidence to the test jurors and permitted some panels of jurors to deliberate together. An alternative set of instructions designed to more clearly explain the statutory sentencing scheme was drafted by a linguistics professor, Judith Levi, and provided to some of the jurors in order to set a measure by which to judge the pattern instructions. According to Diamond, the supplemental study confirms that the pattern instructions result in "substantial levels of miscomprehension," and the alternative instructions substantially reduced the misunderstandings of the burden of proof and the ability to consider unenumerated mitigating factors, while deliberations did not increase accuracy. Diamond Aff. at ¶¶ 7–9.

Whether the Diamond Study sufficiently cures the perceived defects in the Zeisel Study is open to question, *e.g., People v. Brown,* 172 Ill.2d 1, 216 Ill.Dec. 733, 759, 665 N.E.2d 1290, 1316 (1996) (criticizing Diamond Study for failing to show comparability of results between jurors who actually listen to live oral presentations at sentencing hearing and test jurors who listened to audiotaped description of evidence), *cert. denied,* ——

U.S. ——, 117 S.Ct. 398, 136 L.Ed.2d 313 (1996), although the State presents scant argument to refute the study on its merits, *see* Resp.'s Br. at 28.[20] Regardless, the Seventh Circuit has now rejected numerous times Thomas's challenges to the pattern instructions, *Free,* 12 F.3d at 704–06; *Gacy,* 994 F.2d at 311–14; *Williams v. Chrans,* 945 F.2d 926, 935–38 (7th Cir.1991); *Silagy v. Peters,* 905 F.2d 986, 997–1001 (7th Cir.1990), and it is not for us to renounce the rules established in those cases, *Free,* 12 F.3d at 706. Furthermore, *Gacy* held that relying on evidence such as the Diamond Study, conducted long after the petitioner's conviction had become final, to undermine prior holdings that upheld the adequacy of the pattern instructions would constitute the creation of a "new rule" under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), which holds that a federal court may not apply new rules of constitutional law announced after a petitioner's direct appeals have ended. *Gacy,* 994 F.2d at 310–11; *see Free,* 12 F.3d at 705 (characterizing holding in *Gacy*). Accordingly, *Teague* prevents Thomas from securing habeas relief based on a challenge to the pattern instructions.[21]

### G. Misreading of Jury Instructions at Sentencing

■ Next, Thomas argues that the state court misread sentencing instructions to the

**20.** The State does argue that the petitioner procedurally defaulted this claim because the Diamond Study was completed in late 1994, while his appeal was pending before the Illinois Supreme Court. Specifically, the State contends that Thomas should have filed a "motion for leave to file supplemental authority" or present the Diamond Study when Thomas petitioned the state supreme court for rehearing. Resp.'s Br. at 26–27. However, the State fails to cite any Illinois statute, rule, or opinion indicating that a state court would find such omissions to constitute procedural default, and of course we look to Illinois law to determine whether procedural default would apply, *see Hogan v. McBride,* 74 F.3d 144, 146 (7th Cir.), op. modified on other grounds, 79 F.3d 578 (7th Cir.1996). Absent any pertinent discussion by the State, we will not deem this claim procedurally defaulted.

We also point out that neither party seeks dismissal of the petition on the ground that Thomas has not exhausted this claim; indeed, the State's argument for procedural default necessarily means that the State believes the petitioner to have no recourse to the state courts on

this claim. Exhaustion is not a jurisdictional requirement, *Thomas v. Indiana,* 910 F.2d 1413, 1415–16 (7th Cir.1990), and in light of the State's position and our rejection of the claim, we do not believe that we must dismiss the petition as one raising an unexhausted claim in addition to exhausted claims, *cf.* § 2254(b)(2).

**21.** Although the petitioner also maintains that his own counsel misstated the Illinois capital sentencing scheme by suggesting that unanimity as to a mitigating factor was required, Pet.'s Br. at 21 ("Look at the whole picture. Deliberate over the whole picture and then reach your verdict. Your verdict must be unanimous and your verdict will not be questioned."), the Illinois Supreme Court held this claim procedurally defaulted because it was not raised on direct appeal, *Thomas II,* 207 Ill.Dec. at 501, 647 N.E.2d at 994. Petitioner proffers no cause for the default. Similarly, any contention that the prosecutor also misspoke was procedurally defaulted on direct appeal, although the Illinois Supreme Court on postconviction appeal only implicitly rejected this challenge to the prosecutor's statement after mentioning the issue, *see id.*

jury and thus misinstructed the jury. In Illinois, capital sentencing proceedings essentially take place in two phases; the first requires the State to prove that the defendant meets certain statutorily-defined criteria, Ill.Rev.Stat. ch. 38, ¶ 9–1(b) (the defendant must be at least 18 years old at the time of the crime's commission and must be found guilty of murder), and to prove the existence of statutorily-defined aggravating circumstances, ¶ 9–1(b)(1)–(8). To be eligible for the death penalty, the jury must unanimously find beyond a reasonable doubt the existence of at least one of the defined aggravating factors, ¶ 9–1(f), (g), and then the second phase of sentencing commences in which any mitigating factors are weighed against aggravating factors, ¶ 9–1(c).

In this case, Thomas points out that the state court judge misread the instructions pertinent to the first phase. While the written verdict forms correctly informed the jury that it must find the defendant eligible for the death sentence "beyond a reasonable doubt," the state court read the forms to the jury as follows:

[First form] We, the jury, unanimously *find a reasonable doubt* that the defendant, Walter Thomas, is eligible for a death sentence under the law. We unanimously *find a reasonable doubt* that: the defendant was 18 years old or older at the time of the murder for which he was convicted in this case; and we unanimously *find a reasonable doubt* that the statutory aggravating factor exists.

[Second form] We, the jury, cannot unanimously *find a reasonable doubt* that the defendant, Walter Thomas, is eligible for a death sentence under the law. We cannot unanimously *find a reasonable doubt* that the defendant was 18 years of age or older at the time of the murder for which he was convicted in this case or we cannot *find unanimously a reasonable doubt* that a statutory aggravating factor exists.

Tr. 3390–91 (emphases added). As read, the verdict forms effectively reversed what was written on the forms, that is, as read the jury should have returned the second verdict form, not the first, in order to find Thomas

eligible for death. Despite the misreading, the jury returned the correct form to find the defendant eligible for death. Tr. 3394–95 (verdict form read by clerk of court).

On postconviction appeal, the Illinois Supreme Court deemed this claim waived for failure to raise it on direct appeal. *Thomas II*, 207 Ill.Dec. at 502, 647 N.E.2d at 995. Thomas did not offer any reason to the supreme court for the failure to raise the issue, *see id.*, nor does he explain why there exists cause to excuse the procedural default when reviewing his federal habeas petition. Accordingly, the misreading of the verdict forms does not justify habeas relief.

### H. *Misstatements by Prosecutor During Sentencing*

During the sentencing proceeding, the petitioner argues, the prosecutor made several misstatements of law or fact that constituted a violation of due process. Pet.'s Br. at 21–24. Thomas first contends that, although no evidence showed that the victim was still alive when she was set on fire, the prosecutor stated during closing argument that she "la[id] on the floor with her life blood oozing out of her while he set her and that garage on fire." Tr. 3597. According to the State, and uncontested by the petitioner, this claim is procedurally defaulted. Indeed, as far as we can discern, the petitioner has never presented this claim to the state courts, and because it could have been presented to the state trial court via an objection, on direct appeal, or in the postconviction petition, a state court would undoubtedly deem this claim procedurally defaulted. 725 ILCS 5/122–3 ("Any claim of substantial denial of constitutional rights not raised in the original or amended petition is waived."). Nor does Thomas proffer any cause for the default.

Next, Thomas maintains that the prosecutor misstated the law when he said during closing argument, "As his Honor will tell you, sympathy, passion, prejudice, public opinion, public feeling, should not sway you and have no bearing upon your decision in this case." Tr. 3593. The Illinois Supreme Court held that this claim was waived because Thomas did not object to the statement when it was made. *Thomas I*, 148 Ill.Dec. at 769, 561 N.E.2d at 75. In addition, the state supreme

court refused to notice the alleged error as plain error, and did not appear to rely on federal law in any way. *Id.* at 769–70, 561 N.E.2d at 75–76.[22] Because the petitioner again fails to explain why cause exists for the default, we conclude that this claim is procedurally defaulted.

Likewise, Thomas failed to object to several other statements that he now finds objectionable. For example, the petitioner contends that the prosecutor improperly cabined the jury's discretion by stating, "Today is the day for you to impose what the law requires," Tr. 3615, and improperly argued that the defendant had a burden to disprove the applicability of the death penalty by repeatedly making statements such as, "the defendant must be sentenced to death[ ] unless you find that there is some mitigating factor sufficient to preclude you from following the law and from imposing the sentence of death," Tr. 3594; *see also* Tr. 3600, 3632, 3638. On direct appeal, the Illinois Supreme Court deemed these claims waived because Thomas failed to contemporaneously object to the statements during the sentencing hearing. *Thomas I,* 148 Ill.Dec. at 767, 561 N.E.2d at 73 (statements concerning burden-shifting), 76 (statements concerning requirements of law). Again, the petitioner does not set forth any cause for the defaults, and we accordingly cannot grant relief based on these claims.

### I. Confession

Next, the petitioner argues that his confession was involuntarily induced, and thus use of the confession at trial violated his right against self-incrimination and his right to due process. Thomas filed a motion to suppress in state court, and based on the record compiled to decide the motion, the Illinois Supreme Court summarized on direct appeal the following facts:

> The police then contacted defendant on November 28, 1986, in the early afternoon, two days following the murder. Thomas was brought to the Aurora police station, where he remained for 12 hours, during which time he was interrogated, his pants

were taken from him to be tested for apparent bloodstains, and he was required to wear a paper suit. Defendant also signed a written waiver in which he permitted police to search his residence and specifically allowed police to remove certain enumerated items.

. . . .

> Thomas returned, without police escort, to the Aurora police station on December 22, 1986, accompanied by his mother and her friend. There, defendant was interrogated extensively, and he provided blood and hair samples. A polygraph examiner, Robert Cummins, was then brought in. Cummins is also a trained interrogator. Defendant was advised of his rights pursuant to *Miranda v. Arizona* and was interrogated repeatedly throughout the day. Additionally, Detective Davis showed Thomas a newspaper clipping about an execution by lethal injection that occurred in Texas.

> During the evening, police took defendant, his mother and her friend to a restaurant across the street from the station for dinner. After dinner, Cummins administered a polygraph test of Thomas. Cummins also applied what he calls a "nine stage" interrogation technique, which basically provides an outline for the interrogator's method of questioning. Defendant confessed to commission of the crimes soon thereafter.

*Thomas I,* 148 Ill.Dec. at 756, 561 N.E.2d at 62 (citation omitted). In light of these facts, the Illinois Supreme Court refused to overturn the trial court's determination that Thomas voluntarily confessed. According to the state supreme court, the defendant knew that he could leave but chose to remain for the admittedly lengthy interrogations, the defendant voluntarily submitted to the polygraph examination, and the newspaper report of the execution was shown to the defendant several hours before he confessed, and no evidence actually established that he read

---

**22.** Rather than rely on federal law, the Illinois Supreme Court pointed out that the trial court properly instructed the jury that *"mere* sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" should not sway them, and that the attorneys' statements were not evidence. 148 Ill.Dec. at 769–70, 561 N.E.2d at 75–76.

the article. *Id.* at 756–57, 561 N.E.2d at 62–63.

▪ Prior to the passage of the Antiterrorism and Effective Death Penalty Act of 1996, federal district courts gave "independent federal consideration" to the question of the voluntariness of a confession. *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985). Although there are various articulations of the legal standard, *e.g., id.* at 110, 106 S.Ct. at 449–50 (confession must be "the product of a free and rational will"); *Johnson v. Trigg,* 28 F.3d 639, 640–41 (7th Cir.1994), the answer to the question will often involve determining whether certain interrogation techniques "as applied to the unique characteristics of a particular suspect," and "under the totality of the circumstances," resulted in an involuntary confession. *Miller,* 474 U.S. at 109, 112, 106 S.Ct. at 448–49, 450. Although some techniques are " 'inherently coercive,' " *id.* at 110, 106 S.Ct. at 449–50 (quoting *Ashcraft v. Tennessee,* 322 U.S. 143, 154, 64 S.Ct. 921, 926, 88 L.Ed. 1192 (1944)), it is fair to say that in most cases we are answering a " 'mixed questio[n] of fact and law,' " *id.,* 474 U.S. at 111, 106 S.Ct. at 450 (quoting *Townsend v. Sain,* 372 U.S. 293, 309 & n. 6, 83 S.Ct. 745, 755 & n. 6, 9 L.Ed.2d 770 (1963)), when we answer whether a confession was voluntary. When reviewing a state court decision rejecting a defendant's claim that a confession was involuntary, we must ensure adherence to principles clearly established by the United States Supreme Court, and where applicable, make sure the decision involved a reasonable application of the governing law to the facts. *See* § 2254(d)(1), (2); *Lindh,* 96 F.3d at 869, 871. As always, subsidiary questions of fact are "presumed to be correct." § 2254(e)(1).

▪ Our review of the state courts' findings of fact, Tr. 1299–1303; *Thomas I,* 148 Ill.Dec. at 756, 561 N.E.2d at 62, the state supreme court's explanation for rejecting the petitioner's claim, and the governing law, *see*

*Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (cited by *United States v. Church,* 970 F.2d 401, 404 (7th Cir.1992)); *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969), reveals that the decision was neither contrary to clearly established federal law nor an unreasonable application of law to the facts. Although Thomas was interrogated twice and for lengthy amounts of time, the interrogations were separated by over three weeks, and their durations were in part due to delays that actually constituted breaks in the questioning, including meals. Tr. 1302–03. Additionally, at the time, Thomas was a mature, thirty-one year-old adult; he was "never deprived of any food or drink or other necessities," Tr. 1302; and he had been informed of his *Miranda* rights, Tr. 1300–01; *Thomas I,* 148 Ill.Dec. at 756, 561 N.E.2d at 62. Even though the interrogation techniques included the clumsy use of an article reporting an execution in Texas, the state supreme court found that the confession occurred "several hours" later, and reasonably concluded that, under the circumstances, Thomas voluntarily confessed.[23]

▪ Thomas's second challenge to the confession is grounded on his allegation that the Aurora police promised him that, in exchange for a confession, the State would not pursue the death penalty. Pet.'s Br. at 26–27 (citing Tr. 1155, 1240). However, the petitioner did not present this ground to the state supreme court on direct appeal, Def.'s Direct App.Br. at 20–24; Def.'s Direct App.Reply Br. at 1, even though he had the opportunity to do so. Nor does he argue that there exists cause to excuse the default. Accordingly, this claim is not a basis for habeas relief.[24]

### J. Hearsay at Sentencing

The petitioner's penultimate claim is that the use of hearsay testimony at the sentenc-

---

23. Petitioner did not present to the state courts his educational background and intelligence as reasons for concluding the confession involuntary. *Compare* Def.'s Direct App.Br. at 20–24 *with* Pet.'s Br. at 26.

24. We note too that the state trial court appears to have rejected Thomas's testimony that the police promised leniency in exchange for a confession. *See* Tr. 1303 (confession "was without compulsion or inducement").

ing hearing violated his right to confront witnesses. Specifically, he challenges the testimony of two detectives and a court records custodian; all together, the witnesses provided information about Thomas's prior convictions and reported conversations one of the detectives had with tenants in the victim's residential complex. Pet.'s Br. at 27. Once again, however, the Illinois Supreme Court concluded that this claim was waived because it could have been raised on direct appeal. *Thomas II,* 207 Ill.Dec. at 502, 647 N.E.2d at 995. And once again, the petitioner offers no cause for the default. We cannot grant habeas relief based on this claim.

*K. Admission of Electrophoretic Testing*

Finally, the petitioner contends that the state trial court erred in admitting the results of the State's electrophoretic analysis of stains on his clothes that ultimately tested positive for blood. According to Thomas, his right to due process was violated when the trial court refused to hold a hearing to determine the scientific reliability of the method under *Frye v. United States,* 293 F. 1013 (D.C.App.1923), the test for admissibility of scientific evidence adopted by the Illinois Supreme Court, *see People v. Jordan,* 103 Ill.2d 192, 82 Ill.Dec. 925, 932, 469 N.E.2d 569, 576 (1984); *People v. Baynes,* 88 Ill.2d 225, 58 Ill.Dec. 819, 826, 430 N.E.2d 1070, 1077 (1981). The petitioner acknowledges that, prior to trial, the Illinois Appellate Court for the First District held that electrophoresis met the *Frye* test, *People v. Partee,* 157 Ill.App.3d 231, 110 Ill.Dec. 845, 864, 511 N.E.2d 1165, 1184–86 (1987), but argues that the trial court sat in the Second District and thus was not bound by *Partee.* Pet.'s Br. at 28. We cannot fathom, however, and the petitioner does not articulate, how the state trial court's reliance on *Partee* to forego a pretrial hearing on the admissibility of the test results violated due process rather than state law.[25] The state trial court simply granted the State's motion to strike the defendant's motion *in limine,* Tr. 1441, and gave the defendant opportunities to cross-examine the State's expert witness during

trial, *e.g.,* Tr. 2371–92. On direct appeal, the Illinois Supreme Court reasoned that "[t]he *Partee* decision allowed the trial court in this case to effectively take judicial notice of the fact that the relevant scientific community ... has determined that the process itself is reliable." *Thomas I,* 148 Ill.Dec. at 757, 561 N.E.2d at 63. Thomas fails to explain why foregoing a *Frye* hearing prior to trial violated due process, and accordingly this final claim does not support issuing the writ.

### IV. Conclusion

For the reasons discussed above, we deny the petition for a writ of habeas corpus.

It is so ordered.

---

**25.** We point out that the trial court, although sitting outside the First District, was nonetheless bound by that district's appellate court. *See People v. Harris,* 123 Ill.2d 113, 122 Ill.Dec. 76, 81, 526 N.E.2d 335, 340 (1988) (citing *People v. Thorpe,* 52 Ill.App.3d 576, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (1977)).